## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOEL MATIAS,
      Plaintiff,

      v.

C. CHAPDELAINE, et al.,
      Defendants.

No. 3:18-cv-00017 (SRU)

## <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

This is a case about an inmate-against-inmate assault. The victim-inmate—Joel Matias ("Matias")— was assaulted by his cellmate, Mark Silver ("Silver"). Because of that attack, Matias commenced this civil rights action, proceeding *pro se*, under 42 U.S.C. § 1983 against Silver and four Department of Correction ("DOC") employees—Warden Chapdelaine ("Chapdelaine"), Counselor Supervisor R. Weldon ("Weldon"), Exelee Anderson ("Anderson"), and Captain Ogando ("Ogando"). *See* Compl., Doc. No. 1.

Since this action commenced in January 2018, several claims have been dismissed. *See* Initial Review Order, Doc. No. 7; Order, Doc. No. 54. Only two claims and two defendants remain: (1) an Eighth Amendment failure-to-protect claim against Anderson; and (2) an assault and battery claim against Silver.

Now that discovery has concluded, Anderson moves for summary judgment. Doc. No. 132. Principally, Anderson argues that she is not liable for the alleged Eighth Amendment violation because the attack on Matias was spontaneous, and therefore, she could not have been deliberately indifferent. Matias, through counsel, opposed the motion. Doc. No. 142. Oral argument was held in March 2022.

## I.   STANDARD OF REVIEW

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) (plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that

> might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.      BACKGROUND

At all relevant times, Matias was confined at MacDougall-Walker Correctional Institution ("MWCI"). Compl., Doc. No. 1, at ¶ 3.

### *Pre-Incident re: Matias*

Seven years ago, on September 5, 2015, Matias attempted an armed home invasion. Def. Stmnt. of Facts, Doc. No. 132-16, at ¶ 1. The intended target, however, was also armed. *Id.* at ¶ 2. Consequently, Matias was shot in the shoulder, thigh and the upper right side of his head. *Id.* at ¶ 4. Shortly thereafter, Matias was taken by ambulance to Hartford Hospital for treatment of his wounds. *Id.* at ¶ 6. He was also arrested there. *Id.* Thirteen days later, Matias was transferred to the University of Connecticut Hospital, where he remained for three weeks. *Id.* at ¶¶ 7–8. In

3

October 2015, Matias was discharged and admitted into the medical unit at MWCI, where he remained until January 10, 2017. *Id.* at ¶¶ 8, 10.

Upon arrival at MWCI, Matias was initially bedridden. *Id.* at ¶ 11. Over time, he slowly progressed to be able to walk with the assistance of a two-wheeled rolling walker. *Id.* For example, he developed the ability to tend to his activities of daily living, such as getting in and out of bed, getting dressed and undressed, and eating and using the restroom unassisted. *Id.* By November 2016, Matias was in physical therapy and improving his strength, though he still used a walker. *Id.* at ¶ 12.

On January 10, 2017, Matias was discharged from the medical unit to the general population. *Id.* at ¶ 13. Prior to discharge, Matias was issued a year-long "McDougall Equipment Pass" for the wheeled walker, and Matias was given bottom bunk/bottom tier status. *Id.* at ¶ 14. Upon discharge, Matias was supposed to go to L-Pod[1] due to its proximity to the medical unit. *Id.* at ¶¶ 19–20. But there were no spots available, so he was sent to M-Pod. *Id.* at ¶ 19.

### Day of Assault

Nearly a month later, a cell in L-Pod became available. *Id.* at ¶ 21. On February 1, 2017, Matias was informed that he was being transferred to L-Pod. *Id.* To assist Matias with the move, he was accompanied by a correctional move officer, and two[2] infirmary medical workers. Pl. Addt'l Stmnt. of Facts, Doc. No. 143, at ¶ 20. Together, the group walked the approximate one-hundred-foot distance to L-Pod, with the medical worker pushing a cart with Matias's property, and Matias using his two-wheeled walker. Def. Stmnt. of Facts, Doc. No. 132-16, at ¶ 22. Once

---

[1] Pods refer to housing units within MWCI.
[2] Anderson's Statement of Facts states that only one infirmary worker assisted. Def. Stmnt. of Facts, Doc. No. 132-16, at ¶ 22.

they arrived in L-Pod, the move officer left, and correction officer, Anderson, met the group. *Id.*
at ¶ 24.

Anderson had been expecting Matias. *Id.* at ¶ 27. She was assigned as the L-1 Rover[3] that
day, so she received a "move sheet" informing her of the move. *Id.* at ¶¶ 26–27. The move sheet
is generated by the Admitting and Processing ("A&P") unit and lists the cell moves for the day.
*Id.* at ¶ 29. Generally, move sheets do not contain any background information about an inmate,
their classification risk, or need scores. *Id.* at ¶ 31. Rather, it contains the inmate's name, the cell
they came from, the cell they are going to, and their inmate number. *Id.* at ¶ 30. Notwithstanding
the move sheet, Anderson did not know anything about Matias leading up to the transfer. *Id.* at ¶
28. Nor did she know anything about Silver's, Matias's soon-to-be cellmate, background. *Id.* at ¶
33.

Acting as the L-1 Rover, Anderson informed the group that Matias would be placed in
Cell 21 and escorted them to that cell. *Id.* at ¶ 24. On the walk, Anderson noticed that Matias was
using a wheeled walker and observed him "walk[ing] a little funny." Pl. Addt'l Stmnt. of Facts,
Doc. No. 143, at ¶ 22.

Once the group arrived to Cell 21, a control officer opened the door. Def. Stmnt. of Facts,
Doc. No. 132-16, at ¶ 48. Silver was standing near the cell door. *Id.* at ¶ 50. Anderson told Silver
that Matias was moving in and would be his cellmate. *Id.* at ¶ 51. In a normal tone of voice,
Silver responded that he was supposed to have single-cell status. *Id.* at ¶ 52. Anderson requested
proof of such status because her records showed otherwise. *Id.* at ¶ 53. Silver showed Anderson
documentation, which according to Silver reflected that he had been working with prison

---

[3] Rovers "assist[] … escort[], monitor[] or supervise[]" an inmate's move into a new cell. Def. Ex. 6, Anderson Dep.
Tr., Doc. No. 132-6, at 52:19–53:24.

officials to obtain single-cell status.[4] Pl.'s Ex. C, Matias Dep. Tr., Doc. No. 143-3, at 116:19–

117:02. At that point, Anderson informed Silver that she would check with the A&P unit to

confirm Silver's housing status. Def. Stmnt. of Facts, Doc. No. 132-16, at ¶ 54. Meanwhile,

Matias and the medical staff waited outside the cell door. *Id.* at ¶ 55.

The parties dispute the details regarding Anderson leaving to call the A&P unit. By

Anderson's account, Silver requested to speak with a lieutenant prior to Anderson leaving to call

the A&P unit. *Id.* at ¶ 56. Anderson stated she would call one and then walked to the L-1 Bubble.

*Id.* at ¶ 57. The A&P unit checked their records and told Anderson that Silver did not have

single-cell status and was not going to have single-cell status. *Id.* While still at the L-1 Bubble,

Anderson called Lieutenant Rivera and told him that Silver wanted to speak with him. *Id.*

By Matias's account, Matias testified that Silver only requested to speak with a lieutenant

after Anderson returned from the L-1 Bubble and informed him that he did not have single-cell

status. Pl. Addt'l Stmnt. of Facts, Doc. No. 143, at ¶ 25. To this, Anderson replied: "[H]e'll be

around when he comes around." *Id.* Silver testified that he initially requested that Anderson call

his mental health counselor, Ms. Rosario, who he claimed to be working with to obtain single-

cell status. *Id.* at ¶ 26. Anderson responded, seemingly without confirming, that Ms. Rosario was

not working at the time. *Id.* at ¶ 27. Unsatisfied with that response, Silver requested to speak with

a lieutenant. *Id.* at ¶ 28. That prompted Anderson to respond that she would contact one. *Id.* At

some point during this exchange, Silver told Anderson that "this was going to be a bad

situation." *Id.* at ¶ 29. Eventually, Anderson told Silver and Matias to get in the cell. *Id.* at ¶ 31.

Additionally, Anderson told Silver, "[e]ither you can lock up, or you can go to seg." *Id.* at ¶ 32.

**The Assault**

---

[4] This is disputed. According to Anderson, Silver "did not come up with anything." Def. Stmnt. of Facts, Doc. No.
132-1, at ¶ 53.

Once Matias and Silver were secured in the cell, Anderson returned to her post. Def. Stmnt. of Facts, Doc. No. 132-16, at ¶ 66. She carried out her other duties, which included two-unit tours that took less than thirty minutes. *Id.* During those tours, she passed by Cell 21 and did not hear any arguments, threats, cries or any indication that a disagreement was present or brewing in the cell. *Id.* at ¶ 68. At no time during the tours did Matias indicate to Anderson that he felt unsafe. *Id.* at ¶ 69. During Anderson's second tour, Silver did ask Anderson if a lieutenant had toured yet, to which Anderson answered in the negative. *Id.* at ¶ 70.

Shortly thereafter, Silver assaulted Matias. *Id.* at ¶ 73. After finishing her second tour, Anderson heard a bumping sound coming from Cell 21. *Id.* at ¶ 79. Upon immediately responding, Anderson observed Silver on top of Matias. *Id.* She ordered Silver to stop and called a Code Blue. *Id.* Some officers that responded to the scene observed Matias on the floor, not moving, unconscious and covered in blood. Pl. Addt'l Stmnt. of Facts, Doc. No. 143, at ¶ 41.

Following the assault, Matias was taken for medical evaluation, first within the prison and then to John Demsey Hospital. Def. Stmnt. of Facts, Doc. No. 132-16, at ¶¶ 80, 83–84. Meanwhile, Silver was taken to Restrictive Housing. *Id.* at ¶ 81. That escort was filmed. *Id.* During the escort, Silver stated, "I told them I would do this," and "[t]hey keep giving me cellies." *Id.* at ¶ 82. Further, Silver stated "I told her to handle it, she ain't handle it, and that's what happened." Pl. Addt'l Stmnt. of Facts, Doc. No. 143, at ¶ 43. Silver did not mention who was the subject of his statements. Def. Stmnt. of Facts, Doc. No. 132-16, at ¶ 82.

What precipitated the assault is in dispute between Matias and Silver. Matias's position is that the assault was unprovoked by Silver. *Id.* at ¶ 86. In fact, Matias told Lieutenant Rivera right after the assault that he was unsure why he was assaulted. *Id.* On the other hand, Silver's position

is that Matias instigated the fight by stating that he does not like living with [N-words] and threw the first punch. *Id.* at ¶ 73.

***Pre-Incident re: Silver***

Sometime after August 2008, Silver was found guilty of attempted murder and assault in the first degree. Pl. Addt'l Stmnt. of Facts, Doc. No. 143, at ¶¶ 5–6. For that, he was given a forty-year term of incarceration. *Id.* at ¶ 6. In 2011, while housed at MWCI, Silver was charged with assault in the second degree and for having a weapon in a correctional institution after using a weapon to assault a fellow inmate. *Id.* at ¶ 7. During the assault, Silver and another inmate approached the victim from behind and then repeatedly stabbed him in the head and neck areas with sharpened toothbrushes. *Id.* The attack occurred after an argument about a cell move. *Id.*

***Silver's Requests for Single Cell Status***

Silver's requests for single cell status date back to 2014 and 2015. *Id.* at ¶ 12. "Single cell" or "cell alone" status is an unofficial designation that allows an inmate to maintain a cell by him or herself. *Id.* at ¶ 9. Previously, Silver was incarcerated at the Cheshire Correctional Institution ("Cheshire"). *Id.* at ¶ 13. At Cheshire, Silver had an arrangement with one of the unit managers that he would be allowed to live alone and would not receive a cellmate. *Id.* Silver understood that arrangement to mean that he had formal single cell status. *Id.*

On January 13, 2017, while at MWCI, Silver submitted an inmate request to Captain Ogando requesting that Ogando "reinstate [his] single cell to fix any future problems, because [his] understanding was that [he] wasn't going to have any issues with picking [his] cellies." *Id.* at ¶ 14. In making that request, Silver referred to a conversation they had a few days earlier about Silver's issues with his cell status. *Id.* Silver wrote that he had been unsuccessfully trying to work with the administration on getting single cell status, and he was "trying to avoid issues, like

[he] had in the past." *Id.* The next day, Silver complained to mental health staff that the administration was not abiding by their agreement to let him pick his cellmates or give him single cell status. *Id.* at ¶ 15.

Days before the incident, on January 28, 2017, Silver was seen by mental health staff. *Id.* at ¶ 16. Again, Silver expressed his refusal to accept a cellmate, noting that he felt "he can't live with anyone" and that he was "not sure how long this will last." *Id.*

After the incident, on February 17, 2017, Silver was seen by mental health staff, who reported Silver as saying: "I just want it documented that I have informed custody prior to this last assault that I would do this if they give me a cellie. They did anyway. I am not taking another cellie. I've got life. I will kill the next cellie they give me. This will continue. I don't care I've got nothing to lose with a life sentence." *Id.* at ¶ 17.

In June 2017, Silver claimed that prior to the incident he told a mental health worker, Ms. Rosario, that he would assault a cellmate if given one and "[s]he made no attempt to stop the incident from happening." *Id.* at ¶ 18.

After the incident with Matias, Silver went on to attack two more cellmates before he was officially granted single cell status in 2018. *Id.* at ¶ 19; Def. Stmnt. of Facts, Doc. No. 132-16, at ¶ 102.

## III.   DISCUSSION

In this case, Matias contends that Anderson abandoned her duty to protect him from the attack by Silver. That claim is governed by the Eighth Amendment.

      1.   <u>Governing Law</u>

         *a)*   *Failure to Protect*

It is well-established that "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offense against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (cleaned up). Accordingly, the Eighth Amendment imposes on prison officials an affirmative obligation to "take reasonable measures to guarantee the safety of the inmates" and "to protect prisoners from violence at the hands of other prisoners." *Id.* at 832–33 (cleaned up); *see also Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (same); *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment.").

Nonetheless, not every injury suffered by one prisoner at the hands of others establishes constitutional liability on the part of the prison official. *Anderson v. Quiros*, 2018 WL 3677901, at *3 (D. Conn. Aug. 2, 2018) (citing *Farmer*, 511 U.S. at 834). In *Farmer v. Brennan*, the Supreme Court established a two-part test to determine whether failure to protect a prisoner rises to the level of a constitutional violation. 511 U.S. at 834. First, the prisoner must have been "incarcerated under conditions posing a substantial risk of serious harm." *Id.* Second, the prison official must have acted with a "sufficiently culpable state of mind," *id.*, that is, the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *Edwards v. Black*, 854 F. App'x 382, 383 (2d Cir. 2021).

*b)     Factor One: Substantial Risk of Serious Harm*

Regarding the first *Farmer* factor, substantial risk of serious harm, the alleged deprivation must be "sufficiently serious" such that it denies an inmate the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (cleaned up). There is no "bright line

test" to determine whether a risk of serious harm is "substantial" for Eighth Amendment

purposes. *Lewis v. Siwicki*, 944 F.3d 427, 432 (2d Cir. 2019). What matters solely is whether the

"facts, or at least those genuinely in dispute on a motion for summary judgment, show that the

risk of serious harm was substantial." *Vickers-Pearson v. City of New York*, 2020 WL 5732028,

at *5 (S.D.N.Y. Sept. 24, 2020) (quoting *Lewis*, 944 F.3d at 431–32). "Relevant factors include

'the nature of the prison population with whom [the plaintiff] was incarcerated,' and whether

there was specific information ahead of time suggesting that the plaintiff's safety was in

jeopardy." *Vickers-Pearson*, 2020 WL5732028, at *5 (quoting *Lewis*, 944 F.3d at 432).

<em>c)   Factor Two: Deliberate Indifference</em>

Regarding the second *Farmer* factor, deliberate indifference on the part of prison

officials, an inmate must assert facts to show that the prison officials knew that he faced a

substantial risk to his health or safety and disregarded that risk by failing to take corrective

action. *See Farmer*, 511 U.S. at 834, 837. Deliberate indifference is "the equivalent of criminal

recklessness." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). Negligent conduct is

insufficient. *See Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("recklessness entails

more than mere negligence; the risk of harm must be substantial and the official's actions more

than merely negligent") (citing *Farmer*, 511 U.S. at 835–37). Moreover, "prison officials who

actually knew of a substantial risk to inmate health or safety may be found free from liability if

they responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer*,

511 U.S. at 844.

2.   <u>Application</u>

Even viewing the record in the light most favorable to Matias, the facts do not support an

inference that Anderson acted with deliberate indifference.

11

To begin, Anderson did not authorize the transfer. She, instead, facilitated it. As such, the only details she received about Matias or Silver were logistical in nature. Admittedly, this incident was not Anderson's first interaction with Silver.[5] Pl. Ex. D, Anderson Dep. Tr., Doc. No. 143-4, at 214:22–215:25. But it is undisputed that Anderson never knew anything about Silver's mental health, disciplinary history, or prior inmate requests. Def. Stmnt. of Facts, Doc. No. 132-16, at ¶ 33; Pl. Ex. D, Anderson Dep. Tr., Doc. No. 143-4, at 215:25. Thus, for Anderson to have been deliberately indifferent, Matias needs to point to statements or actions made during the transfer that should have put Anderson on notice. *See Fernandez v. New York City Dep't of Correction*, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) ("Absent clear notice of a risk of harm to the prisoner, "[c]ourts routinely deny deliberate indifference claims based upon surprise attacks.") (cleaned up).

During the transfer, Anderson and Silver had a verbal exchange; the precise details of which are disputed. Silver testified that, at some point during the conversation with Anderson, he stated "this was going to be a bad situation." Pl. Addt'l Stmnt. of Facts, Doc. No. 143, at ¶ 29. Furthermore, Silver testified that Anderson told him that "he can lock up, or [he] can go to seg." *Id.* at ¶ 32. Anderson, on the other hand, testified that those statements were never made. Construing the evidence most favorably to Matias, a factfinder could conclude from the conversation that there was a risk of harm to Matias, especially if Silver's comment is construed as a threat. *C.f., Dublin* v. *New York City Law Dep't*, 2012 WL 4471306, at *5–7 (S.D.N.Y. Sept. 26, 2012) (granting summary judgment to defendants where a verbal exchange preceding a fight

---

[5] In actuality, Anderson's prior interactions with Silver aid, rather than harm, her position for summary judgment. Anderson testified that she only briefly interacted with Silver during her tours, and that he always treated her "in a respectful manner." Pl. Ex. D, Anderson Dep. Tr. at 214:22–215:25. Based on those positive interactions, a reasonable factfinder could not conclude that Anderson had any reason to know Silver had a violent propensity.

*did not* include any threats). And, given Matias's physical condition, a reasonable jury could find that Anderson needed to treat Silver's potential threat with even greater care because she observed that Matias "walked a little funny," used a walker and could not carry his own property. Pl. Addt'l Stmnt. of Facts, Doc. No. 143, at ¶ 22.

That being said, Matias cannot prevail without evidence demonstrating that Anderson appreciated and disregarded the risk to him. The record, however, is bereft of such evidence. In fact, the evidence supports that Anderson was not a passive bystander. *See c.f., Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (holding that the jury was entitled to find deliberate indifference where the officer had been "notified … of the threat against plaintiff and the need for a transfer" and "had done nothing to effect that transfer" before the plaintiff was severely beaten). Once Silver objected to the transfer, Anderson asked Silver for paperwork. It is disputed whether Silver produced any paperwork. But it remains true that the paperwork Silver presented to Anderson, if any, confirmed that Silver did not have single-cell status. Working to obtain such status and having that status are two different things. The interaction could have ended there. Anderson, however, took the extra step of confirming with A&P that Silver did not have single-cell status. At what point Silver requested to speak with a lieutenant is disputed. But even if Anderson did not call a lieutenant, she was not obligated to comply with each of Silver's demands.

Of even greater import, the evidence demonstrates that Anderson was not indifferent to the risk of harm to Matias, once she became aware of it. When Anderson recognized that a fight had broken out, she responded quickly. She arrived moments after the fight began, verbally ordered the inmates to stop fighting, and ordered a code blue. Those facts, alone, counsel *against* finding that Anderson was deliberately indifferent. *See Williams v. McGibbons*, 2018 WL

13

5728066, at *4 (N.D.N.Y. May 7, 2018) (dismissing claim for failure to protect where defendant "immediately intervened and instructed [the parties] to stop fighting"); *Vickers-Pearson*, 2020 WL 5732028 at *7 (finding that officer was not indifferent to the risk of harm to plaintiff, once he became aware of it because he "responded quickly"); *Vincent* v. *Sitnewski*, 117 F. Supp. 3d 329, 337 (S.D.N.Y. June 25, 2015) (finding that, no reasonable fact finder could conclude that defendant officers were deliberately indifferent where plaintiff failed to prove that they "had actual or constructive knowledge" of a threat to plaintiff from other inmates or that they failed to discharge their responsibilities once they arrived to the scene of a fight).

Taken together, a reasonable factfinder could not conclude that Anderson acted with deliberate indifference to Matias's safety.[6] Therefore, I **grant** Anderson's motion for summary judgment.

## IV.    REMAINING CLAIM

Having dismissed the claim against Anderson, the only remaining claim is Matias's state law claim against Silver. Where all federal claims have been dismissed, the district court may decline to exercise supplemental jurisdiction over pendent state law claims. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over state law claims where all federal claims have been dismissed); *see also Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases supporting proposition that district court should decline to exercise supplemental jurisdiction where all federal claims have been dismissed). I decline to exercise supplemental jurisdiction over Matias's state law claim. Therefore, I also **dismiss without prejudice** the assault and battery claim against Silver.

---

[6] Because I have concluded that Matias failed to meet the subjective *Farmer* prong, it is unnecessary to decide whether Matias satisfied the objective prong of *Farmer. See Lee v. Artuz*, 2000 WL 231083, at *5 (S.D.N.Y. Feb. 29, 2000) (declining to decide whether the plaintiff satisfied the objective prong when it was clear that plaintiff could not establish subjective prong).

## V.    CONCLUSION

For the foregoing reasons, Anderson's motion for summary judgment is **granted**. The state law claim against Silver is dismissed without prejudice. The Clerk is directed to enter judgment in favor of Anderson and to close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 29th day of September 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge